IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHERINE DOYLE,<br><br>            Plaintiff,<br><br>   v.<br><br>CT CORPORATION SYSTEM ET AL.,<br><br>            Defendants.<br>_____/ | No. C 10-05147 CRB<br><br>**MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT** |

Plaintiff Katherine Doyle sued her employer, Defendant CT Corporation System ("CTS") and related entities, for age discrimination in connection with her termination following a merger. See generally Compl. Defendant AccessData Group, LLC ("ADG") now moves for summary judgment. See generally Mot. Because Defendant has presented evidence that it had a legitimate, nondiscriminatory reason for terminating Plaintiff, and Plaintiff has not presented specific and substantial evidence that that reason is a pretext for discrimination, the Court GRANTS Defendant's Motion.

**I.    BACKGROUND**

    **A.    Plaintiff's Employment History**

Plaintiff is now 58 years old. Opp'n at 11. Plaintiff was hired at Summation Legal Technologies in 1999,[1] and shortly thereafter became a sales account representative for the company. Doyle Dep. (McCoy Decl. Ex. 2 at 45-46. She was an "inside sales

---

[1] In 2004 or 2005, her employed became CTS. Id. ¶ 56.

representative" ("ISR"), using phone and email, and rare travel, to sell Summation products. Id. at 47. In that role, Plaintiff spent the majority of her time dealing with existing customers. Id. at 49. Some of the customers she worked with were in California and the Midwest. Id. at 46; Exelrod Decl. Ex. 1 at 50.

In about 2006, Plaintiff became the International Territory Sales Manager. Doyle Dep. (McCoy Decl. Ex. 2) at 57-58. Plaintiff was responsible for international sales, while responsibility for United States sales was divided up among other territory managers. Id. at 59. Plaintiff's job duties were essentially the same for the entire four years that she held that position: she "dealt with a variety of people. . . both on the phone and on email, with very rare travel." Id. at 60. She estimated that she spent between 50 and 80 percent of her time servicing existing customers, and allowed that it is possible that she spent up to 80 percent on them. Id. 63, 64. And she acknowledged that she did "a larger percentage" of her work with resellers, rather than direct customers. Doyle Dep. (Exelrod Decl. Ex. 2) at 84. At her deposition, she did not know of any business that she closed in the last year of her employment, outside of business she did with resellers. Doyle Dep. (Shostak Decl. Ex. 1) at 90. Plaintiff maintained, however, that she was engaged simultaneously with resellers and customers. Doyle Dep. (Exelrod Decl. Ex. 2) at 88.

Other than two trips to Canada to go to events held by resellers, Plaintiff never traveled to any international destinations in the course of her work. Doyle Dep. (McCoy Decl. Ex. 2) at 70; Doyle Dep. (Shostak Decl. Ex. 1) at 68. Asked about business in the United Kingdom, she responded, "We had very little business in the UK, and I don't remember the names of the customers in the UK." Doyle Dep. (McCoy Decl. Ex. 2) at 70. She reiterated that there were "very, very few" customers in the UK. Id. Plaintiff explained that CTS "didn't really have a good presence there, as we did in other countries." Id. at 73. She agreed that there it was a struggle to develop business in the UK the entire time she was the international territory sales manager. Id. at 77.

Plaintiff knew in 2010 that there were some problems with CTS's sales organization that needed to be fixed. Id. at 98. Plaintiff was aware that there had been a decrease in

revenue. Id. at 99. She was also aware that her own sales numbers had significantly declined as of mid-2010, and that her numbers would indicate that she was not achieving her sales goals for the year. Doyle Dep. (Shostak Decl. Ex. 1) at 133, 196.

### B.  ADC's International Business Pre-Merger

AccessData Group, Inc. ("ADC") sold investigative computer software, services and training to help individuals search computer hard drives. Leehealey Dep. (McCoy Decl. Ex. 3) at 12. Although ADC initially only had domestic sales staff, who were responsible for covering the entire world, as of April 2010, it switched to "having an international sales office that was focused on selling to the international community." Tramonte Dep. (McCoy Decl. Ex. 4) at 37. ADC's director of international sales is Simon Whitburn, who is located in London. Id. at 38; Whitburn Decl. ¶ 2.

In 2008, ADC had relocated a U.S. resident and ADC employee to the U.K. Tramonte Decl. ¶ 3. The process was "lengthy, difficult, complicated and very expensive for ADC." Id. After that experience, ADC's CEO, Tim Leehealey, and its Vice President of Commercial and International Sales, Trey Tramonte, "decided to avoid going through that process again" and concluded that they "would not relocate a U.S. resident to work in the U.K." Id.

In late 2009, ADC became interested in acquiring CTS. Leehealey Dep. (McCoy Decl. Ex. 3) at 13. Negotiations began in earnest in early 2010, and by March 2010 there was a letter of intent in place. See id. at 14-15. Tramonte and Leehealey planned "from the outset of the merger discussions . . . to hire local personnel in the U.K. because (1) [they] wanted a physical presence in the U.K. and (2) [they] did not want to take on the expense and aggravation of trying to move U.S. employees." Id.

### C.  ADC's Pre-Merger Discussions and Diligence re CTS

Leehealey's interest in acquiring CTS came from a conversation with Andrew Stein, a former colleague who had worked for CTS. Leehealey Dep. (McCoy Decl. Ex. 3) at 13. Stein told Leehealey that, other than four members of the sales staff that did not include Plaintiff, "'Everyone else is worthless.'" Id. at 20.

3

In mid-March 2010, Trey Tramonte attended a meeting on behalf of ADC with individuals from CTS, in which they discussed ADC acquiring CTS. Tramonte Dep. (McCoy Decl. Ex. 4) at 28. They discussed revenue, and specifically that "the company was trending in the wrong direction . . . losing 10, 20 percent in annual revenues year over year and had been on that trend for the past three to five years." Id. at 29-30.

In about mid-April, CTS created an online "deal room," and loaded documents into it so that Tramonte could do due diligence about the company. Id. at 31. There is no evidence that the resumes of CTS sales staff were in the deal room. Id. at 90. The international sales were broken out, and the poor numbers stood out to Leehealey and Tramonte. Tramonte Decl. ¶ 4, Leehealey Decl. ¶ 4. The data showed a 50 percent decrease in international sales for 2010 from the previous year. Id. It confirmed for Leehealey and Tramonte their decision that, if the merger went through, they would need to hire a U.K. employee for international sales immediately. Id.; Leehealey Dep. (McCoy Decl. Ex. 3) at 23, 31-32; Tramonte Dep. (McCoy Decl. Ex. 4) at 44-46, 51.

In late April 2010, after the creation of the deal room, ADC and CTS executives met and discussed problems with the existing CTS sales organization. Tramonte Dep. at 33-34. They did not discuss individual employees. Tramonte Decl. ¶ 5. "[T]he international sales numbers, and the year-over-year drop, stood out and was discussed by the group." Id. CTS conceded that "their international sales numbers were dismal." Id. Ranji Ragbeer, who was then running CTS's sales organization, gave his assessment that CTS "had a lackluster sales team in general," that "the company as a whole was in trouble, and that the atmosphere was not one of success in general." Tramonte Dep. (McCoy Decl. Ex. 4) at 36-37.

As of May 2010, Tramonte sent Leehealey an email about pursuing the hire of three additional international sales representatives. Tramonte Decl. ¶ 6. Simon Whitburn, ADC's director of international sales, turned to recruiting for the U.K. position in mid-June 2010, contacting a former colleague, Jeremy Lynch. Whitburn Decl. ¶ 5. Lynch was a U.K. resident and had relevant experience. Id.

4

On June 14, 2010, Tramonte attended a meeting with ADC and CTS executives. Tramonte Decl. ¶ 10. Tramonte asked CTS's interim CEO, Curtis Allen, for his perspective on the existing sales force and how the "reps [were] doing in relation to [Allen's] expectations." Id. Allen laughed and said: "Well, I'll tell you like this. Kitty Doyle" – Plaintiff – "is the number one sales rep, but she didn't close anything on her own; most of her money comes from re-sellers. In 2009, she did $1.2 million year to date, with $600K year to date in 2010." Id. Tramonte responded. "If that's the best you've got, we don't need to continue the conversation." Id.; see also Tramonte Decl. Ex. B (notes of conversation). The June 14, 2010 meeting was the first time Tramonte learned that the international sales numbers "were comprised of almost exclusively reseller revenue." Tramonte Decl. ¶ 11.[2] Tramonte states that he was "very disappointed" to learn that CTS['s] so-called top sales representative (Doyle) had a 50% year-over-year decline in her sales numbers and was focused primarily on processing resellers' sales." Id. He asserts that the information he learned on June 14, 2010 "solidified [the] decision" he had already made to hire a U.K. resident to work in the U.K. as International Channel Manager, as "[t]he CTS model of international sales . . . did not work for CTS nor would it work for us." Id. ¶ 13.

Prior to June 15, 2010, no personnel information about CTS employees had been disclosed to ADC management. Id. ¶ 9; Tramonte Dep. (McCoy Decl. Ex. 4) at 53 ("I didn't have any personnel files that were made available to me that I was aware of. So no, all I looked through were the numbers.").

The first time Tramonte was introduced to the CTS sales force was June 15, 2010. Tramonte Dep. (McCoy Decl. Ex. 4) at 50. When he met with them that day, Tramonte gave the CTS sales force an overview of who ADC was, and then met with individual sales staff one on one. Id. His purpose in meeting with them was to find out what was happening in their territories and how they were performing year-to-date. Tramonte Decl. ¶ 14. At that point, he had already decided that the company would need an international presence to be

---

[2] Plaintiff disputes this, and the Court accepts Plaintiff's version of the facts for the purposes of this Motion.

5

successful. Tramonte Dep. (McCoy Decl. Ex. 4) at 51. ADC was already "actively looking for an individual to fill that Summation international channel role." Id. The company felt that "the fact that we had really no presence, no client base within the largest English-speaking region outside of the United States . . . was kind of beyond us and we knew that we needed to have somebody located in that geography." Id.

Plaintiff met with Tramonte on June 15, 2010. Tramonte Decl. ¶ 15. According to Tramonte, Plaintiff admitted that she was not actively doing business in the U.K. and that "her time was primarily spent reacting to requests and follow up items from resellers." Id.; Tramonte Dep. (McCoy Decl. Ex. 4) at 72-73; Doyle Dep. (McCoy Decl. Ex. 1) at 125 ("may have" discussed with Tramonte that she was not doing any business in the U.K.). Tramonte's notes from the meeting state: "mainly reacting to requests & follow up items." Tramonte Decl. Ex. B at 241. Plaintiff disputes this account, claiming that it is not accurate that the majority of her time was spent on resellers' orders. See Opp'n at 4 (citing Doyle Dep. at 88 (Q: "Is it true to say that although your duties included direct sales. . . you were mostly focused on processing orders for software sold by international resellers?" A: "I don't believe that's accurate.")). As this is Defendant's Motion, the Court accepts Plaintiff's version of the facts. Plaintiff does not deny admitting that she had a significant drop in revenue in 2010. Compare Mot. at 9; Opp'n at 3-4. Tramonte did not ask Plaintiff her age.[3] Doyle Dep. (McCoy Decl. Ex. 2) at 126.

Also on June 15, 2010, ADC's human resources manager, Susan Korn, received the resumes of the CTS sales team for the first time. Korn Decl. ¶ 3 ("the first time [they] had ever been provided to me, and to anyone at [ADC] as far as I am aware."). She forwarded them to Tramonte on June 16, 2010, and he read them that evening. Id.; Tramonte Dep. (McCoy Decl. Ex. 4) at 89-90. Plaintiff's resume included no employment history before 1984 and no schooling time periods. Doyle Dep. (McCoy Decl. Ex. 2) at 131.

//

---

[3] Plaintiff asserts without reference to any evidence that, at this meeting, "Mr. Tramonte had an opportunity to see [Plaintiff]. [Plaintiff's] appearance is age appropriate." Opp'n at 4.

6

### D.  Merger Takes Place, Plaintiff is Terminated

The merger of CTS and ADC took place in July 2010.  Tramonte Decl. ¶ 2.  The new company became known as ADG.  Id.  Leehealey explained at his deposition that ADC initially wanted to terminate all of CTS's account executives, but learned that they were obligated to retain a significant percentage of CTS employees and would only terminate about 40 people.  Leehealey Dep. (McCoy Decl. Ex. 3) at 23-25.  Plaintiff learned that her job had been eliminated.  Doyle Dep. (McCoy Decl. Ex. 2) at 134.  Her last day was July 21, 2010.  Id. at 216-17.  None of the other ISRs lost their jobs.  See Opp'n at 5.

## II.  LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A principal purpose of the summary judgment procedure "is to isolate and dispose of factually unsupported claims."  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

Defendants move for summary judgment on Plaintiff's two causes of action: (1) age discrimination under FEHA; and (2) failure to prevent age discrimination under FEHA.  See generally Mot.

### A.  First Cause of Action: Age Discrimination

Plaintiff's first cause of action alleges that her termination constituted age discrimination in violation of California's Fair Employment and Housing Act (FEHA), Cal.

Gov't Code § 12940(a).[4]  Compl. (Wohl Decl. Ex. A) ¶¶ 15-20.  "An employee alleging age discrimination must ultimately prove that the adverse employment action taken was based on his or her age."  Hersant v. Cal. Dept. of Soc. Servs., 57 Cal. App. 4th 997, 1002-03.  Because direct evidence is rare, California courts employ a burden shifting analysis to resolve age discrimination cases.  Id. at 1002.  This is the same burden shifting analysis announced by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354 (2000) (explaining that "[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes").

Under the burden shifting analysis, a plaintiff must first establish a prima facie case of discrimination.  See id. ("This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled.").  If a plaintiff succeeds in establishing a prima facie case, a presumption of discrimination arises, and the burden shifts to the defendant to rebut the presumption by producing admissible evidence that its action was taken a legitimate, nondiscriminatory reason.  Id. at 355-56.  If the employer sustains its burden, the presumption of discrimination falls away.  Id. at 356.  The plaintiff then must raise a genuine issue of material fact as to whether the employer's proffered reasons are pretexts for discrimination, or offer any other evidence that the employer acted with a discriminatory motive.  Id.  The plaintiff may demonstrate pretext "by either [1] directly persuading the court that a discriminatory reason more likely motivated the employer or [2] indirectly by showing that the employer's proffered explanation is unworthy of credence."  Aragon v. Republic Silver State Disposal Co., 292 F.3d 654, 658-59 (9th Cir. 2002) (internal quotation marks omitted).  If circumstantial evidence is offered, such evidence must be "specific" and "substantial" to create a triable issue.  Godwin v. Hunt

---

[4] Gov't Code § 12940(a) provides in relevant part that "It is an unlawful employment practice . . . (a) For an employer, because of . . . age, . . . to discharge the person from employment."

8

Wesson Inc., 150 F.3d 1217, 1222 (9th Cir. 1998); Little v. Windermere Relocation, Inc., 301 F.3d 958, 971 (9th Cir. 2002).[5]

Defendants here assume that Plaintiff has met her initial burden of establishing a prima facie case. Mot. at 15. Accordingly, this Order addresses only the questions of (1) whether Defendant has presented evidence of a legitimate, nondiscriminatory motive for Plaintiff's termination, and (2) whether Plaintiff has raised a genuine issue of material fact as to whether that reason is a pretext for age discrimination. See Guz, 24 Cal. 4th at 354-56.

### 1. Legitimate, Nondiscriminatory Reason

Defendants offer two reasons for Plaintiff's termination: first, that her job was restructured and relocated to the U.K., and second, that the information Defendants had about Plaintiff's performance did not justify retaining Plaintiff in a new, domestic position. See Mot. at 16-19; Tramonte Decl. ¶ 15 ("At the time I met with her, Tim Leehealey and I had already made the decision regarding replacing [Plaintiff] with a U.K.-based employee and I was not considering [Plaintiff] for the international position. I did not consider [Plaintiff] for a domestic position because she was focused on resellers and was not actively selling as was needed domestically.").

The first reason, relating to the relocation of the international sales position to the U.K., finds ample support in the evidence. See, e.g., Tramonte Dep. (McCoy Decl. Ex. 4) at 37 (ADC already had "an international sales office that was focused on selling to the international community"); id. at 38; Whitburn Decl. ¶ 2 (ADC's director of international sales was already located in London); Tramonte Decl. ¶ 3 (ADC's prior experience relocating a U.S. resident employee to the U.K. did not work out well and led to a decision not to do so again); Leehealey Dep. (McCoy Decl. Ex. 3) at 14-15 (Tramonte and Leehealey planned "from the outset of the merger discussions . . . to hire local personnel in the U.K.). In fact, "[f]or this Motion only, Plaintiff agrees that ADG made a decision to locate

---

[5] But see Pullom v. U.S. Bakery, 477 F. Supp. 2d 1093 (D. Or. 2007) (internal citations omitted) (explaining that "Although the Ninth Circuit has not overturned its precedent requiring 'substantial' and 'specific' circumstantial evidence, the court noted . . . that 'Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence.'").

9

international sales in the United Kingdom and that it did not want to relocate a US citizen again to work in the United Kingdom." Opp'n at 7. The first reason is therefore undisputed.

The second reason, relating to Plaintiff's performance, is also supported by the evidence. Tramonte asserted:

> [G]iven our assessment of the organization as a whole, <u>we weren't interested in taking people that, again, from our perspective, weren't up to snuff and moving them into a new role</u>. I mean, our frank assessment and their management's frank assessment is that they were all subpar. They were – none of the reps were very good. But we were in a position where we had to retain some to maintain that tribal knowledge to understand what had happened in the past so that we could be successful in the future. So <u>we really weren't looking to shuffle the deck. We were trying to keep a select few individuals that could be successful in their current roles</u>.

Tramonte Dep. (McCoy Decl. Ex. 4) at 78 (emphasis added). Plaintiff was responsible for international sales. Doyle Dep. (McCoy Decl. Ex. 2) at 59. And international sales were poor. Tramonte Decl. ¶ 4, Leehealey Decl. ¶ 4 (starkly poor international sales numbers stood out to Leehealey and Tramonte). Plaintiff acknowledged that her own sales numbers had significantly declined as of mid-2010, and that her numbers would indicate that she was not achieving her sales goals for the year. Doyle Dep. (Shostak Decl. Ex. 1) at 133, 196. And Defendant had been told that, although Plaintiff was "the number one sales rep" by some metrics, "most of her money comes from re-sellers." See Tramonte Decl. ¶ 10.[6]

Defendant has therefore met its burden of producing admissible evidence that Plaintiff's termination was for a legitimate, nondiscriminatory reason. See Guz, 24 Cal. 4th at 355-56. The presumption of discrimination therefore vanishes, and Plaintiff must "raise a genuine factual question as to whether the proffered reason is pretextual." See Shelley v. Geren, — F.3d — No. 10-35014, 2012 WL 89215, at *9 (9th Cir. Jan. 12, 2012).

### 2. Pretext

Plaintiff argues that she has raised three such issues of fact as to whether her age was a motivating factor in the decision not to offer her employment. Opp'n at 7. These are: (1)

---

[6] Whether or not this is true is beside the point. An employer's true reasons can be "wrong, mistaken, or unwise" – just not discriminatory. See Horn v. Cushman & Wakefield Western, Inc., 72 Cal. App. 4th 798, 807 (1999). "While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with <u>a motive to discriminate illegally</u>. Guz, 24 Cal. 4th at 358.

10

1  whether Defendants preferred younger workers; (2) whether Defendants' focus in making
2  personnel decisions was really sales; and (3) whether Plaintiff should have been shifted to a
3  domestic position. Id. at 6-11.

### i. Preference for Younger Workers

Plaintiff points to two lists of workers to support her assertion that there is a dispute of fact as to whether Defendants preferred younger sales representatives. See id. at 7-8. The first list is the ISRs working for ADC before the CTS acquisition: they are five individuals between the ages of 28 and 35. Id. at 7 (citing Exelrod Decl. ¶ 8, Ex. 5). The second list is the ISRs hired by ADG in 2010: they are eight individuals between the ages of 25 and 64. Id. at 8 (citing Exelrod Decl. ¶ 8, Ex. 5). Plaintiff argues that "other than Mr. Mullinax,[7] who was acquainted with Mr. Tramonte from prior mutual employment, . . . just as with . . . ADC, no one over thirty five years old worked as an ISR at ADG in 2010." Id. at 8.

But these two lists do not support an inference of discrimination. As an initial matter, the sample sizes of five and eight are simply too small to provide much basis for analysis. See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 996-97 (1988) (statistical evidence may not be probative if based on "small or incomplete data set"); Guz, 24 Cal. 4th at 367 ("in other cases where alleged numerical favoritism of younger workers arose within an extremely small employee pool, courts have rejected any consequent inference of intentional bias on grounds, among others, that the sample was too minuscule to demonstrate a statistically reliable discriminatory pattern"); Stout v. Potter, 276 F.3d 1118, 1123 (9th Cir. 2002) ("sample involving 6 female applicants in a pool of 38 applicants is likely too small to produce statistically significant results"); Shutt v Sandoz Crop Protection Corp., 944 F.2d 1431, 1433 (9th Cir. 1991) (sample of 11 too small).

In addition, the lists mean very little without any basis for comparison. See Stout, 276 F.3d at 1123. "Generally, the appropriate population is the applicant pool or relevant labor market from which the positions at issue are fulled." Id. Plaintiff has presented no evidence pertaining to the applicant pool for the ISR positions, either before or after the merger. The

---

[7] See also Burnett Dep. (McCoy Decl. Ex. 5) at 38 (estimating Mullinax's age at 64).

11

1 lists therefore do not constitute evidence that Defendants have a preference for younger
2 workers.

### ii. Focus on Sales Data

Plaintiff next asserts that Tramonte had access to the CTS "Sales Dashboard," which illustrated that Plaintiff was the top ranked ISR according to the "performance against quota" metric. Opp'n at 8-9 (citing Exelrod Decl. ¶ 7, Ex. 4). She argues that because "[t]he sales results confirm that Ms. Doyle was among the best performers and yet she was the one ISR not selected," there is a dispute of fact as to whether Tramonte was really focused on sales results when he selected ISRs. Opp'n at 8-9. Not so.

Accepting that Plaintiff was the top-ranked ISR according to the "performance against quota" metric, and assuming that that is the most important metric (there is no evidence of this), Defendants had been informed by CTS's CEO that Plaintiff's rank as the "number one sales rep" was misleading: "Kitty Doyle is the number one sales rep, but she didn't close anything on her own; most of her money comes from re-sellers." See Tramonte Decl. ¶ 10. Plaintiff disagrees with that characterization, see Opp'n at 9, and it might well be hyperbolic, but there is undisputed evidence that Plaintiff worked extensively with resellers. Plaintiff herself acknowledged that she did "a larger percentage" of her work with resellers, rather than direct customers, Doyle Dep. (Exelrod Decl. Ex. 2) at 84, and, at her deposition, she did not know of any business that she closed in the last year of her employment outside of business she did with resellers, Doyle Dep. (Shostak Decl. Ex. 1) at 90. Nor does Plaintiff dispute that the CTS CEO's comment discounting her "number one" rank was communicated to Tramonte. Whether or not objectively correct, Tramonte could have legitimately used that statement as a basis for his decision. See Guz, 24 Cal. 4th at 358 ("[an employer's] true reasons need not necessarily have been wise or correct . . . While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with a motive to discriminate illegally.).

Moreover, other sales-related bases for Defendants' decision are undisputed. Plaintiff was responsible for international sales, Doyle Dep. (McCoy Decl. Ex. 2) at 59, and

12

international sales were poor, Tramonte Decl. ¶ 4; Leehealey Decl. ¶ 4; Supp. Tramonte Decl. ¶ 2. In fact, one piece of data showed a 50 percent decrease in international sales for 2010 from the previous year. Tramonte Decl. ¶ 4; Leehealey Decl. ¶ 4.[8] Plaintiff's own sales numbers had significantly declined as of mid-2010, and her numbers indicated that she was not achieving her sales goals for the year. Doyle Dep. (Shostak Decl. Ex. 1) at 133, 196. Even assuming Plaintiff's assertion that "[a]ll of the sales people had a drop in revenue from the previous year, and most a larger drop than [Plaintiff]," Opp'n at 10 (citing Exelrod Decl. ¶ 7, Ex. 4), Plaintiff does little to undermine Defendants' claim that Plaintiff did not have "a sufficiently impressive package of achievement to merit shaking things up by firing someone who was already in direct domestic sales," see Reply at 5.

### iii. Shift to Domestic Position

Relatedly, Plaintiff argues that there is a dispute of fact as to why Plaintiff was not considered for a domestic position. See Opp'n at 9-11. There is not.

Plaintiff complains that "the evidence that ADG relies on that the ISRs are subpar, the out-of-court statements of Mr. Stein, Mr. Ragbeer and Mr. Allen, is inadmissible as hearsay." Id. at 9. Plaintiff also submits a declaration stating that Stein and other critics hardly knew her. See Doyle Decl. ¶ 4 ("During [Stein's] short employment there I never worked with him. I never had substantive conversations about work issues with him."). But this line of argument misses the mark. Whether or not the statements are true, and whatever their foundation, they were communicated to the Defendants, and are offered to show their effect on the Defendants. See Fed. R. Evid. 801(c) (defining hearsay as out of court statement offered to prove the truth of the matter asserted); U.S. v. Arteaga, 117 F.3d 388, 397 (9th Cir. 1997) (statements offered to show effect on hearer not hearsay). Moreover, as already discussed, there is significant evidence that Plaintiff's performance in her job (and the CTS sales team's performance generally) was unsatisfactory.

---

[8] Plaintiff disputes the extent to which international sales were down, see Opp'n at 9 ("Mr. Leehealey's number was wrong"), but does not dispute that they were down, see Doyle Dep. (Shostak Decl. Ex. 1) at 133, 196-97.

13

1    Plaintiff also argues that "Peter Morse who was an ISR who covered the whole
2 Southeast for [CTS], which included Washington DC, was retained by ADG and moved to
3 the ADG federal team." Id. at 10. But Defendants offer undisputed evidence that Morse was
4 transferred by CTS, not ADG, before the acquisition. Tramonte Dep. (Exelrod Decl. Ex. 2)
5 at 83-84. Morse had been selling to the federal government and became an addition, and not
6 a replacement, to the ADG federal group in Washington D.C. Id. at 81-84.

7    Plaintiff next describes herself as "a repository of institutional knowledge for other
8 parts of the country such as the Midwest and California which she had covered at one time,"
9 and "a repository of knowledge for the International territory." Opp'n at 9. But Plaintiff had
10 done only international work since 2006. Doyle Dep. (McCoy Decl. Ex. 2) at 57-58. There
11 is no evidence that Plaintiff's four-year-old knowledge of the Midwest and California was
12 superior to that of the ISRs who were currently servicing those areas, nor that she had any
13 ongoing relationships with clients in those areas, as the existing ISRs surely did. See
14 also Tramonte Dep. (McCoy Decl. Ex. 4) at 78 ("we really weren't looking to shuffle the
15 deck. We were trying to keep a select few individuals that could be successful in their
16 current roles."). Although Plaintiff asserts that she was a "repository of knowledge for the
17 International territory," as already discussed, Defendants had good cause to be unhappy with
18 CTS's work on international sales, for which Plaintiff was largely responsible. In addition,
19 Plaintiff does not explain how any such knowledge would have been relevant to domestic
20 sales.[9]

21    Plaintiff's work was heavily focused on telephone and email communications, and she
22 was rarely in the field. See Reply at 7 (citing Doyle Dep. (McCoy Decl. Ex. 2) at 60-61).
23 Plaintiff did a significant amount of her work with resellers, rather than selling directly to
24 customers. Doyle Dep. (Exelrod Decl. Ex. 2) at 84; Doyle Dep. (Shostak Decl. Ex. 1) at 90.
25 She also estimated that she spent between 50 and 80 percent of her time servicing existing
26 customers, and allowed that it is possible that she spent up to 80 percent on them. Doyle

---

[9] Plaintiff's additional argument, about Christian Burnett's appointment to an ISR position focused on Canada, fails in light of her concession that ADG chose to locate its international sales team in the U.K. Opp'n at 7.

14

Dep. (McCoy Decl. Ex. 2) at 63, 64. Defendants reasonably concluded that this was not the kind of current experience that they wanted for their domestic ISRs. See Tramonte Decl. ¶ 15.

### iv.     Conclusion as to Pretext

The Court therefore finds that Plaintiff has not raised a genuine factual question as to whether Defendants' reasons for terminating her are pretextual. In reaching this conclusion, the Court is guided in part by Shelley, 2012 WL 89215, a Ninth Circuit opinion filed the day before the motion hearing in this case. At the motion hearing, Plaintiff asked the Court to review Shelley for guidance on the issue of pretext, and the Court has done so. In Shelley, the district court had granted summary judgment in favor of a defendant employer in an ADEA case,[10] and the Circuit reversed. Id. at *1. The Circuit found that the plaintiff had demonstrated both direct and circumstantial evidence of pretext. Id. at *9. As for direct evidence, the relevant decision-makers had inquired about the projected retirement dates for employees in the hiring pool during the hiring period, raising an "inference that they considered this information relevant to their decisions." Id.[11] As for indirect evidence, the Circuit found that there was a factual dispute about whether the plaintiff was better qualified than the individual who was hired over him. Id. at *10 (noting that "a plaintiff's superior qualifications, standing alone, may be sufficient to prove pretext"). On this point, the Circuit primarily discussed the plaintiff's years of experience, "more impressive and recent awards," and superior educational qualifications.

Here, in contrast to Shelley, Plaintiff has no direct evidence that Defendants' decision was motivated by her age: no one at ADG made any statements or inquiries about her age. She was therefore required to offer circumstantial evidence of pretext that is both "specific"

---

[10] As Plaintiff noted at the motion hearing, Shelley is an ADEA case and this case was brought under FEHA. Nonetheless, the Court agrees with Plaintiff that Shelley is relevant, as both apply the same McDonnell Douglas burden-shifting analysis.

[11] Shelley distinguished this inquiry from a situation in which "the decision-makers may have known of the candidates' ages." Id. Here, Plaintiff merely argues that "Mr. Tramonte had an opportunity to see [Plaintiff]. [Plaintiff's] appearance is age appropriate," Opp'n at 4; under Shelley, this would not support an inference of discrimination. See id.

15

and "substantial." See Godwin, 150 F.3d at 1222. She has not done so. As in Shelley, Plaintiff had more years of experience than the other ISRs, see Opp'n at 9, but that is presumably the case in many age discrimination suits, and cannot substitute for evidence of a candidate's actual qualifications. See Shelley, 2012 WL 89215, at *15 (Bybee, J., concurring in part and dissenting in part) ("every employer knows that mere years in service is not a perfect proxy for competence"). Unlike in Shelley, there is no evidence that Plaintiff had a better education, or more accolades than, the other ISRs. The only real arguments that Plaintiff makes of her superior qualifications are (1) that she was the top ranked ISR according to the "performance against quota" metric, and (2) that she was a repository of institutional knowledge. See Opp'n at 8-9. But, as discussed above, neither argument is compelling: the first, Defendants were informed, was misleading; the second offers little benefit to domestic sales.[12] Because Plaintiff has not demonstrated that she has superior qualifications for a domestic sales position, even her indirect evidence is less than what the plaintiff presented in Shelley.

None of the issues raised by Plaintiff – (1) whether Defendants preferred younger workers; (2) whether Defendants' focus in making personnel decisions was really sales; and (3) whether Plaintiff should have been shifted to a domestic position, see Opp'n at 6-11 – "raise a genuine factual question as to whether the proffered reason is pretextual." See Shelley, 2012 WL 89215, at *9. Accordingly, Plaintiff has not met her burden as to pretext.

### 3. Conclusion as to First Cause of Action

Because Defendant has presented evidence that it had a legitimate, nondiscriminatory reason for terminating Plaintiff, and Plaintiff has not presented specific and substantial evidence that that reason is a pretext for discrimination, Defendant is entitled to summary judgment on the first cause of action.

## B. Second Cause of Action: Failure to Prevent Age Discrimination

---

[12] Plaintiff concedes that "ADG made a decision to locate international sales in the United Kingdom and . . . did not want to relocate a US citizen again to work in the United Kingdom," Opp'n at 7, and thus only quarrels with Defendants' failure to place her in a domestic sales position.

16

Plaintiff's second cause of action alleges that the Defendants failed to take all reasonable steps necessary to prevent age discrimination from occurring, in violation of FEHA, Cal. Gov't Code § 12940(k).[13] Compl. (Wohl Decl. Ex. A) ¶¶ 21-26. That cause of action is entirely dependent on the first cause of action. See id. ¶ 23 ("The defendants acting together have allowed discriminatory terminations of and refusals to employ workers over the age of 40 to proceed unabated."). Accordingly, it fails for the same reasons as Plaintiff's first cause of action.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion for Summary Judgment as to both causes of action.

**IT IS SO ORDERED.**

Dated: January 18, 2012

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

---

[13] Gov't Code § 12940(k) provides in relevant part that "It is an unlawful employment practice . . . (k) For an employer . . . to fail to take all reasonable steps necessary to prevent discrimination . . . from occurring."